K. E. SENTNEY et al., and THE STATE OF KANSAS, ex rel. E. T. FOOTE, as County Attorney, etc., Intervenors, Appellants, v. THE HUTCHINSON INTERURBAN RAILWAY COMPANY, Appellee.

No. 18,777.

SYLLABUS BY THE COURT.

1. CONTRACT—Stock in Railroad—Signed by One Party Only—When Binding. A valid contract in writing signed by one of the parties only but fully recognized and acted upon by both parties is binding.

2. EVIDENCE—Conclusions of Witness—Received without Objections—No Prejudicial Error. Findings of fact supported by testimony of witnesses, who without objection give their conclusions as to the nature and effect of conversations and discussions instead of the language used in such conversations and discussions, will not for that reason be set aside.

3. STREET RAILWAY—Extension—Agreement of Landowner—Default—Removal of Tracks—Injunction. Landowners who by purchase of stock procured the extension of a street railway and an agreement to operate the same over their lands for five years in consideration of their platting and placing such lands on the market can not, after failing so to do for four years, maintain injunction to prevent the removal of such extension, the company being solvent and the trial court having determined that the damages, if any, could be recovered in an action at law.

Appeal from Reno district court; DANIEL A. BANTA, judge pro tem. Opinion filed October 11, 1913. Affirmed.

·W. G. Fairchild, F. L. Martin, and H. S. Lewis, all of Hutchinson, for the appellants.

A. C. Malloy, and F. Dumont Smith, both of Hutchinson, for the appellee.

The opinion of the court was delivered by

WEST, J.: The plaintiffs brought this action to enjoin the defendant from tearing up and removing a portion of its track. The state was made a party on

Sentney v. Interurban Railway Co.

the relation of the county attorney, but owing to the character of the road in question it is not necessary to consider any matters touching the interests of the public, but only those in which the original plaintiffs and defendant are concerned.

Early in May, 1908, the defendant was operating its road in Hutchinson from Main street east on Fourth to Lorraine street. Farther east certain additions had been platted and north. of one of them was located the soda ash plant. A project was on foot to extend the car line east so as to reach the neighborhood of various additions, when it was suggested by plaintiff K. E. Sentney to Mr. Carey, president of the railway company, to abandon that project and join with K. E. Sentney and others in extending the road in another direction. K. E. Sentney and his brother C. N. Sentney then owned a quarter section north of the soda ash plant, one-third of which they offered to Mr. Carey at cost, which he accepted, and the three then organized as the Sentney Land Company, which afterwards obtained another eighty, making 240 acres in all. The other plaintiffs owned tracts of land on the line of the suggested extension, and it was proposed by K. E. Sentney that the plaintiffs purchase enough stock to enable the road to build through their lands and purchase a new car for operation over the extension. At this time Mr. Carey was president of the defendant road and a stockholder, and Mr. K. E. Sentney was a director and stockholder. The proposed extension would reach the neighborhood of the soda ash plant, and the supposition was that if this proved a success it would mean the employment of a large number of hands who would need homes in the vicinity and who would also need transportation. The land owned by plaintiff Smith was already platted; that owned by the Fernie brothers was not and there is no claim or pretense that they ever personally agreed to plat theirs. A proposition, however, on behalf of all these landowners was made to the defendant by K. E.

Sentney, and after various meetings and discussions by the parties interested the board of directors of the railway company, on May 15, 1908, as shown by the minutes of the meeting, considered an extension proposed by Mr. Sentney representing certain landowners, that he and his interested associates would subscribe for enough stock to enable the company to extend the line on Fourth avenue east, thence north and east to the soda ash plant as an objective point; and "It was moved by L. A. Bunker that the proposition be accepted and when seconded, motion was left to the Board of Directors who decided in the affirmative. The president and secretary were authorized to make a contract with Mr. Sentney and his interested land owners which should be protective to the Street Ry. Co." Shortly thereafter Mr. Sentney procured a contract to be drawn, by Mr. Malloy who was then or afterwards became attorney for the railway company, by which the company bound itself to extend its line from the present eastern terminus on Fourth avenue, "over a route or right-of-way to be furnished by second parties and located as mutually agreed upon between the parties hereto, to a point at the north side of the Soda Ash Plant now being constructed on the eastern boundary of the City of Hutchinson and to operate cars over said extension for a period of five years from the date of the completion of said extension and to operate its cars between the hours of six A. M. and nine P. M. at intervals of not less than one hour apart. . . . Said second parties agree, and do hereby grant to first party a perpetual right-of-way across the lands owned by said second parties subject only to the conditions named in this agreement, said right-of-way to be located as mutually agreed upon between parties hereto."

A contract was then drawn, to be signed by the plaintiffs, specifying the portions the various owners were to pay. While the contract first mentioned was not in fact signed by the officers of the defendant it was nev-

ertheless used in connection with the other contract which was signed by the landowners, the payments were made as agreed upon, and accepted and used by the defendant, so that the contract was treated as if signed, and it was equally binding. One or two of the landowners endeavored to get the defendant company to agree to operate ten years instead of five, but the terms as already quoted were not changed. The soda ash plant, on the success of which the entire scheme of extension and development was bottomed, was for quite a time a failure. In 1911 it was handled by a new management which succeeded in putting out the product in commercial quantities, and quite a number of men were employed, but it was not yet demonstrated that it would succeed as a financial venture. Mr. Carey, who was then president of the soda ash plant, soon ascertained that being the only one of its kind west of the Mississippi river it must meet the competition of great industries controlled by unlimited capital in the East and that it was practically impossible to market the product at a profit. In May, 1911, he wrote one of the plaintiffs complaining that he had not platted his land and put it upon the market and intimated that unless this was done the route would have to be changed. It appears, however, that he suggested to another of the plaintiffs that it was not worth while to plat at that time as there was no market for such property. Some of the plaintiffs did plat portions of their land but did not place the plats on file. Afterwards, about the close of 1911 the soda ash plant was sold to eastern investors, and just before this the president, Mr. Carey, suggested to the Sentney brothers that their three eighties of land be divided, which was done, whereupon Mr. Carey sold his eighty to eastern investors for $16,000, with the privilege of removing the tracks, and shortly thereafter announced that the plant had been sold and that the route would be changed so as to reach the additions farther south.

The theory of the plaintiffs appears to be that the extension was made over their lands in consideration of the stock they bought and paid for but that no contract was made with the railway company that they were to plat and put their lands on the market, or make Thirteenth street a boulevard or plant trees on either side thereof, or make the streets conform to those of the city; that the extension was made in view of the hope for success of the soda ash plant, and that success having now become assured they are entitled to have the road operated for the full five-year period, and having granted a right of way are entitled to have the track remain thereon and to enjoin the railway company from ceasing to operate the cars and from tearing up and removing the track.

The theory of the defendant appears to be that it made the extension upon the express contract and agreement that the plaintiffs were to plat and put their lands upon the market, make a boulevard of Thirteenth street and adorn the same with shade trees, conform the streets to those of the city, and so conduct matters that homes would be built and sold to people who would furnish patronage for the railway; that the plaintiffs had allowed practically four years of the time to elapse without complying with their part of the contract, that they have filed no plats, made no boulevard, planted no shade trees; and instead of arranging to sell houses and lots have put their land in alfalfa and other crops which do not in any wise enhance the patronage of the railway company.

The trial court made eighteen findings of fact. The seventh was to the effect that it was generally believed that the establishment of the soda ash plant would attract other enterprises and create a demand for homes for their employees. The tenth was that at all of the preliminary meetings looking to the extension it was proposed that such extension should pass over the lands of the plaintiffs.

"It was represented at said meetings that in the event of the construction of the road over the desired extension the owners of said property would exploit that section of the city for homes, would plat their tracts, lay off and dedicate streets and alleys, make the East and West Streets conform to the streets already platted in the city, that the car line running East and West would be so located as to be upon an extension of 13th street; that a boulevard would be laid off and dedicated along the car line, and that the land would be placed upon the market and sold, inducements held out to purchasers to build and establish homes in that vicinity, to enlarge and extend the city in that direction, and to supply patronage for said lines."

A part of the eleventh finding was that at the May 15th meeting K. E. Sentney, representing certain owners, proposed that they would purchase sufficient stock to create a fund for the extension, and "it was there represented that the said land would be platted, the streets and alleys dedicated, the land placed upon the market and sold for the purpose of building up and exploiting that portion of the city." The twelfth was that the written contract was never executed by the defendant and did not contain all the stipulations between the plaintiffs and the defendant in this, "that it does not contain the terms of the agreement of the plaintiffs to plat their lands into lots, blocks, streets and alleys and to dedicate the same, exploit the same by placing it upon the market for sale," etc.

It is vigorously contended that there was no evidence on which to base the finding of any agreement or contract to plat and exploit the land, and especially none on which to base the finding that the written contract did not contain all the stipulations which were entered into. This is really the vital point in the case. While the statements upon the stand were quite general in their nature touching this matter, and while many of them would seem to indicate that the witnesses were giving their own conclusions of what was agreed upon rather than the actual statements on which such con-

clusion was based, still such testimony seems to have gone in without objection, and the trial court could not avoid giving it proper consideration. In Mr. Carey's cross-examination we find this statement:

"The understanding of Mr. Smith, Mr. Fernie, Mr. Edwards and Mr. Sentney was that that whole territory should be developed; this land was to be put on the market, and we would have in a little while, we would have built up and have patronage for the car line. The directors could give no other excuse under the sun for building this line out there if they did not expect this to be placed on the market, and it was so understood; it was so understood, and it was so argued in every meeting of the board of directors and at all times."

Mr. Guyman testified:

"Of course we could not build out that way if they did n't expect to build up some revenue for the company. It was talked over that the land would be put on the market and a boulevard would be put out there. In a general way it was talked of that way. It was understood that it was to be built up."

Mr. Bunker testified:

"There was talk at the board of directors meeting that the land would be platted and sold and built up along the railroad. . . . There was talk indulged in as to cost of operation. We thought it would not pay the first year or two, but after we got houses out there we thought it would. Mr. Sentney made these statements about the people putting up the houses."

The testimony showed and it was found that the car had been operated at a loss of about $15 a day. The court found that the Sentney Land Company advertised this property for sale for a short time in the early part of 1909, that there was no market and there were no sales, and it has never been offered for sale either in lots or parcels since; that at the time the extension was made it was expected by all parties that the maintenance of the soda ash plant would occasion the building up of that portion of the city; that the plant was not a commercial success at first, and shut

Sentney v. Interurban Railway Co.

down early in July, 1909; that in September, 1911, it was reopened, and save for temporary shut-downs it manufactured soda ash in merchantable quantities; that about January, 1912, it became a matter of public notoriety that the operation of the plant was successful and it was then employing an average of 150 men; that about January, 1912, Mr. Carey caused the interest he held in the Sentney Land Company to be set off to him, and he soon thereafter disposed of it to the present operators of the ash plant for $16,000, with right of removing defendant's tracks therefrom; that K. E. Sentney was requested to submit a price upon his eighty and submitted a proposition of $24,000. The eighteenth finding was:

"The removal of the tracks from plaintiff's land would result in no material damage thereto. After such removal that portion occupied by the tracks would be as available for agricultural purposes as the adjoining land."

The first conclusion of law was that the removal of the tracks and the cessation of the operation of the line "would result in no material damage to the plaintiff, which could not be recovered in an action at law." The effect of the findings and conclusions is that the plaintiffs have not complied with the contract they made with the defendant company, and that while the defendant had not operated a car for five years as it had agreed, the plaintiffs had not platted their lands, and therefore if the track should be removed the plaintiffs would be able in an action at law to recover whatever actual damages were occasioned by such removal. It appears that the stock which the plaintiffs purchased in order to secure the extension has turned out to be a most excellent investment, having advanced from less than par to twice or three times its face value, which would indicate that the defendant was not insolvent or in danger of insolvency.

To the writer it seems that discussions relative to

platting and exploitation took place as stated, but that the contract itself, carefully drawn and deliberately considered, embraced all that was actually agreed upon, and that the plaintiffs are entitled to an injunction at least until the expiration of the five-year period, with the right within that time to plat their lands and improve the same as originally intended in case the success of the soda ash plant made the same practicable.

However, the court is of the opinion and holds that the findings of fact were sustained by the evidence. The trial court also took the view that the remedy of the plaintiffs, if any, lay in an action at law. This question need not now be considered.

The judgment is affirmed.